[No. C066545. Third Dist. Oct. 17, 2013.]

DALE M. WALLIS, Plaintiff and Appellant, v.
PHL ASSOCIATES, INC. et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts I, II, IV, V and VI.

**COUNSEL**

Murphy, Campbell, Guthrie & Alliston, Murphy, Campbell, Alliston & Quinn, George E. Murphy, Suzanne M. Nicholson, J. Douglas Durham; Law Office of Joel C. Baiocchi and Joel Christopher Baiocchi for Plaintiff and Appellant.

Downey Brand, Tory E. Griffin; and Klaus J. Kolb for Defendants and Appellants.

**OPINION**

**NICHOLSON, Acting P. J.**—Plaintiff Dale M. Wallis invented an antigen for a bovine mastitis vaccine as part of her duties as an employee of defendant PHL Associates, Inc. (PHL), more than 20 years ago. The vaccine was eventually sold to Upjohn, and this protracted litigation has featured the contest between Wallis and PHL over the benefits related to that sale. A jury concluded that PHL and Wallis agreed that Wallis would own the antigen, but the jury also concluded that PHL committed no fraud relating to the antigen. Instead, the jury concluded PHL committed fraud relating to Wallis's money—$20,000 she paid to PHL and its shareholders (also defendants) to buy stock in PHL. Based on this conclusion, the jury awarded Wallis a total of more than $2 million dollars in compensatory damages and $500,000 in punitive damages. Finding unjust enrichment, the trial court awarded Wallis a constructive trust against PHL of more than $1 million. Both sides appeal.

We conclude that (1) the jury's verdict that PHL (and the individual defendant shareholders) committed fraud related to Wallis's money does not support the damages award of more than $2 million; (2) given the required reduction of the fraud damages, the punitive damages award against PHL must also be reduced; (3) the trial court's equitable award must be reversed and remanded for a new trial because the court improperly denied PHL's request for a statement of decision; (4) the trial court erred by offsetting the award of damages to Wallis before computing prejudgment interest; and (5) we need not resolve several additional issues raised by the parties because of how we resolve the issues already mentioned.

We therefore modify the judgment as to the jury verdict and remand for recalculation of prejudgment interest, and we reverse and remand the judgment as to the equitable relief.

## FACTS

Defendant PHL develops, produces, and markets animal biologics (commercial biotechnology products). Individual defendants Jeffrey Wichmann, Mary Holmes, and Thomas Hanzo were shareholders and directors of PHL. Before 1989, Holmes held 20 percent of the stock, and Wichmann and Hanzo each held 40 percent.

PHL hired plaintiff Wallis in October 1988. Wallis served as PHL's director of laboratories.

In the fall of 1988, Wallis developed the J-5 TC antigen (referred to hereafter as the antigen) for a vaccine for bovine mastitis. In a vaccine, the antigen is the active ingredient that invokes the immune response. It was disputed at trial whether Wallis developed the antigen on her own time or within the scope of her PHL employment. As we discuss later, the jury concluded that she developed the antigen within the scope of her PHL employment.

In May 1989, Wallis and PHL negotiated terms of a long-term employment contract, including a term that any inventions or products she developed would remain her own. However, the agreement was never finalized.

In June 1989, Wallis met with the PHL board of directors to discuss the production of a vaccine using the antigen. The board expressed a desire to do so, but Wallis felt the board was reneging on its promise to make her a

shareholder. She told PHL's attorney, Thomas Strohl, that she was considering taking the antigen to another company.

PHL gave Wallis a raise and the opportunity to purchase 20 shares of PHL stock for $1,000 per share. Purchase of the shares would entitle Wallis to a position on the board of directors. Wallis paid $15,000 to PHL for 15 shares in July 1989 and paid the individual defendants a total of $5,000 for five shares in December 1989 ($1,000 to Holmes and $2,000 each to Wichmann and Hanzo). After she paid for the PHL shares, she was given a vote in board meetings.

PHL began using the antigen to manufacture vaccine for the market. Wallis received shareholder bonuses through 1990 and part of 1991.

In 1991, PHL negotiated with Upjohn to sell the vaccine. During the negotiations with Upjohn, PHL fired Wallis. She refused an offer from Wichmann and Holmes to buy back her shares because she believed she was entitled to one-sixth of the Upjohn deal. Wichmann, Hanzo, and Holmes voted to remove Wallis from the board of directors.

In January 1992, PHL finalized the sale of the vaccine to Upjohn for $2.5 million. PHL agreed not to compete with Upjohn for 10 years, and Upjohn agreed that PHL would be the exclusive producer and supplier of the antigen in the United States.

In March 1992, PHL attorney Vigfus Asmundson sent Wallis a letter notifying her that she was not a shareholder because she had purchased only an option to become a shareholder after five years of employment. Strohl enclosed checks to refund the purchase price of the shares plus interest. Wallis rejected the characterization of the transaction and refused to cash the checks.

Meanwhile, Wallis's husband at the time, James Wallis, started an animal biologics company, Hygieia Biological Laboratories (Hygieia), in February 1991. After Wallis left PHL, she became an unpaid consultant for Hygieia. In 1993, she was put on the Hygieia payroll. Hygieia developed and marketed its own J-5 antigen, and Wallis contacted Upjohn trying to get Upjohn to purchase the vaccine from Hygieia.

In 1993, Upjohn sued Wallis and Hygieia in federal court, alleging that they were infringing on the vaccine Upjohn had purchased from PHL. Wallis and Hygieia filed a counterclaim. The court granted summary judgment to

Upjohn on the counterclaim, and the parties settled Upjohn's claim with Wallis agreeing that Upjohn owned the rights to the vaccine.

## PROCEDURE

Wallis filed a complaint against PHL, Wichmann, Hanzo, and Holmes on June 22, 1994.[1] The complaint alleged causes of action for unjust enrichment, fraud, conspiracy, constructive fraud, constructive trust, and conversion. Wallis alleged but later dismissed a spoliation of evidence cause of action. Wallis did not allege a breach of contract cause of action. The complaint also named attorney Strohl as a defendant, but he is not a party to this appeal.

PHL filed a cross-complaint against Wallis, James Wallis, and Hygieia on February 11, 1999. The cross-complaint alleged causes of action for declaratory relief, rescission, intentional interference with contractual advantage, fraud, misappropriation of trade secrets, conversion, breach of fiduciary duty, unfair competition, and conspiracy.

Wallis moved to bifurcate trial on the complaint and cross-complaint and to stay discovery on the cross-complaint until after trial on the complaint. The trial court granted the motion, and trial on the complaint began with Judge Stephen L. Mock presiding.

After Wallis's case-in-chief, the trial court granted motions for nonsuit on the constructive fraud cause of action as to all defendants and the conversion cause of action as to the individual defendants.

The jury returned special verdicts on June 13, 2000, as follows:

*General Allegations*

—Wallis invented the J-5 TC antigen.

—She developed the antigen as part of her duties as an employee of PHL.

—Wallis and PHL agreed that she would own the antigen.

*Fraud Relating to the Antigen*

—Neither PHL nor any of the individual defendants made a false promise or false representation to Wallis related to the *antigen*.

---

[1] Hereafter, we refer to defendants collectively as PHL, except where further specification is necessary.

*Fraud Relating to Wallis's Money*

—PHL did not make a false promise to Wallis related to her *money*.

—The individual defendants made a false promise to Wallis related to her *money* and did not intend to perform on the promise.

—PHL and the individual defendants knowingly made a false representation to Wallis related to her *money* for the purpose of inducing Wallis to justifiably rely on it, which she did, unaware that the representation was false and that PHL and the individual defendants did not intend to perform on it.

—Wallis's fraud cause of action was not barred by unclean hands.

—Wallis did not fail to mitigate her damages caused by fraud.

—Wallis's damages for fraud were $1,944,997 against PHL, $259,330 against Wichmann, $259,330 against Hanzo, and $129,665 against Holmes.

*Conversion of the Antigen*

—PHL did not deliberately interfere with the *antigen*.

*Conversion of Wallis's Money*

—PHL deliberately and unjustifiably interfered with Wallis's $15,000, but did not interfere with Wallis's $5,000.

—PHL did not make a good faith offer to return $20,000 to Wallis.

—Wallis's conversion claim against PHL was barred by neither the statute of limitations nor unclean hands.

—Wallis's total damages suffered as a result of PHL's conversion of her money was $1,944,997.

—The individual defendants deliberately and unjustifiably interfered with Wallis's $5,000 but did not interfere with Wallis's $15,000.

—The individual defendants did not make a good faith offer to return $5,000 to Wallis.

—Wallis's conversion claim against the individual defendants was barred by neither the statute of limitations nor unclean hands.

—Wallis's total damages suffered as a result of the individual defendants' conversion of her money was $259,330 against Wichmann, $259,330 against Hanzo, and $129,665 against Holmes.

*Punitive Damages*

—PHL and the individual defendants committed fraud, but not with malice or oppression.

—The jury did not assess punitive damages against the individual defendants.

—The jury assessed $500,000 in punitive damages against PHL.

—The jury did not include in their assessment of compensatory damages for fraud and conversion any damages intended for the sake of example or for the purpose of punishment.

In summary, the jury found PHL liable for fraud and conversion related to Wallis's money and assessed $1,944,997 in compensatory damages and $500,000 in punitive damages, and the jury also found the individual defendants liable for fraud and conversion related to her money and assessed compensatory damages only: $259,330 against Wichmann, $259,330 against Hanzo, and $129,665 against Holmes. The jury did not find PHL and the individual defendants liable for fraud related to the antigen.

After the jury trial was completed, Judge Mock heard argument on the equitable causes of action. The court granted the individual defendants' motion for nonsuit on the unjust enrichment and constructive trust causes of action as it relates to the antigen, but it denied PHL's similar motion for nonsuit. With respect to unjust enrichment related to Wallis's money, the trial court denied the motions for nonsuit of both PHL and the individual defendants (although the trial court later determined that Wallis had an adequate remedy at law as to the money).

On September 26, 2000, the court ruled on the equitable causes of action. It stated that it was bound by the factual determinations of the jury. Concerning the merits, the court stated there was no oral or written contract providing Wallis with compensation for the antigen. However, it would be unfair to Wallis to allow PHL to retain the money it received for the antigen. Based on this reasoning, the court found there was unjust enrichment and that the appropriate equitable remedy was a constructive trust.

Concerning whether PHL wrongfully acquired the antigen from Wallis, the court stated: "There's no question that the Defendants acquired the antigen. Without the antigen there could be no vaccine[. N]othing would have been sold to Upjohn. [¶] Now, the Defendants argue that when the jury found that there was no fraud and no conversion with regard to the antigen, then the Court is precluded from imposing constructive trust. [¶] I acknowledge the jury's finding under Civil Code Section 2224, constructive trust can be imposed when there's any kind of wrongful taking whether it's by accident, mistake, undue influence, the violation of a trust or any other wrongful act. [¶] In this case there's no question that PHL took the antigen without any compensation due to the Plaintiff. I find that at the time the Defendants took the antigen and failed to pay the Plaintiff they were operating under what I would call a mistake of fact."

Based on this reasoning, the court imposed a constructive trust of $671,262 against PHL for royalties PHL received for the antigen after it was sold to Upjohn up to May 2000. It also imposed a constructive trust of $562,500 against PHL for the noncompetition agreement between PHL and Upjohn. As to this amount attributable to the noncompetition agreement, however, the trial court was not prepared to calculate interest. As to the $20,000 Wallis paid for the shares in PHL, the court stated that she had an adequate remedy at law. Finally, the court stated that it was unprepared to rule on the issues of whether to require an accounting or appoint a receiver. It therefore took that issue under submission, as well as the issue of interest on the amount attributable to the noncompetition agreement.

At the end of the hearing on September 26, 2000, and in response to a question from counsel for PHL, the court stated that it did not intend its ruling to be final until it had made a decision on the issue of interest.

On November 16, 2000, the court held another hearing on its equitable decision. It stated that on the issue of prejudgment interest for the constructive trust for the noncompetition agreement it would award $189,273.71, making the total equitable judgment $1,423,035.71. The court then discussed with counsel for the parties whether to appoint a receiver. Unsure how to proceed, the court asked the parties to file letter briefs on the issue.

On December 28, 2000, the court held a hearing to address two remaining issues: whether a receiver could be appointed and, if so, whether the court should appoint one then. The court stated that the requirements for appointment of a receiver were met in this case, but that a receiver would not be

appointed, with the understanding that other steps would be taken to preserve assets available to satisfy the judgment.

The court lifted the stay on the cross-complaint proceedings. Because the cross-complaint was still pending, the court did not enter judgment.

On January 5, 2001, PHL filed a written request for statement of decision on the equitable issues tried to the court. The court, however, denied the request as untimely.

In July 2002, Wallis filed a notice of peremptory disqualification of Judge Mock under Code of Civil Procedure section 170.6, and Judge Mock stepped aside.

Hanzo passed away in 2004, and his estate settled with Wallis. For that reason, neither Hanzo nor his estate's representative is a party to this appeal.

In April 2008, the case was assigned to Judge David De Alba of the Sacramento County Superior Court.

In April 2010, the parties settled the cross-complaint, with Wallis paying PHL $1,827,000. PHL dismissed the cross-complaint on July 6, 2010.

With the cross-complaint dismissed, the parties filed briefs concerning the judgment to be entered on the 10-year-old jury verdicts and equitable decisions on the complaint. Wallis stated that the damage awards against PHL for fraud and conversion were duplicative and elected to recover on the fraud cause of action. Wallis also stated that $562,500 of the equitable award attributable to the noncompetition agreement between Upjohn and PHL duplicated another part of the award.

On July 10, 2010, 16 years after filing of the complaint and 10 years after trial, Judge De Alba entered judgment. As later amended, the judgment against PHL was $1,944,997 on the jury's fraud verdict, $500,000 on the jury's punitive damages verdict, and $671,262 on the equitable claims. The court also awarded prejudgment interest on $789,259 (the amount of the compensatory damages award in Wallis's favor minus the amount of the settlement on PHL's cross-complaint) at a rate of 7 percent from the date of the verdict. The judgment against Wichmann was "$259,330 for fraud and deceit together with prejudgment interest from the date of the verdict for a total of $443,049." And the judgment against Holmes was "$129,665 together

with prejudgment interest from the date of the verdict for a total of $221,525."

PHL and Wallis filed postjudgment motions. PHL filed motions· for new trial, for judgment notwithstanding the verdict, and to set aside the judgment, while Wallis filed a motion for new trial. Judge De Alba expressed concern that he did not have jurisdiction to entertain the postjudgment motions because he was not the trial judge, but the parties stated that they had no objection to his ruling on the motions. The court took the matters under submission and later issued a ruling denying all postjudgment motions.

## DISCUSSION

### I, II*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### III

#### Equitable Relief

After the jury trial ended, the court held proceedings on the equitable relief requested by Wallis. The court imposed a constructive trust of $671,262 against PHL for royalties PHL received for the antigen from Upjohn and $562,500 for the noncompetition agreement. After the court issued its ruling on the equitable issues, PHL requested a statement of decision, but the trial court denied the request as untimely. On appeal, PHL contends that the trial court prejudicially erred by denying the request for a statement of decision. We conclude the request was proper and should have been granted. We also conclude that, because Judge Mock has been disqualified, the only remedy for this error is remand for a new trial.[3]

Code of Civil Procedure section 632 states in relevant part: "In superior courts, upon the trial of a question of fact by the court, written findings of fact and conclusions of law shall not be required. The court shall issue a

---

*See footnote, *ante*, page 814.

[3] PHL also contends that the granting of equitable relief based on unjust enrichment cannot stand because (1) Wallis had an adequate remedy at law, (2) enforcement of the agreement that Wallis would own the antigen was time-barred, and (3) there was no evidence of an agreement between PHL and Wallis that Wallis would own the antigen. PHL bases these contentions on the argument that the trial court relied on some kind of contract theory in granting equitable relief. We need not consider these contentions because the denial of the request for a statement of decision was reversible error. We also note that the trial court's apparent theory for granting equitable relief was mistake of fact, not a contract theory.

statement of decision explaining the factual and legal basis for its decision as to each of the principal controverted issues at trial upon the request of any party appearing at the trial. The request must be made within 10 days after the court announces a tentative decision . . . ."

■    The purpose of a statement of decision is to provide an explanation of the factual and legal basis for the trial court's decision. (*Onofrio v. Rice* (1997) 55 Cal.App.4th 413, 425 [64 Cal.Rptr.2d 74].) It gives the parties and the appellate court a clear understanding of the facts and law relied on by the court to reach its decision. (*Slavin v. Borinstein* (1994) 25 Cal.App.4th 713, 718 [30 Cal.Rptr.2d 745].) If a party does not request a timely statement of decision, all intendments favor the ruling of the trial court and an appellate court must assume the trial court made whatever findings are necessary to sustain the judgment, as long as those findings are supported by substantial evidence. (*Michael U. v. Jamie B.* (1985) 39 Cal.3d 787, 792–793 [218 Cal.Rptr. 39, 705 P.2d 362], superseded by statute on another issue as stated in *In re Zacharia D.* (1993) 6 Cal.4th 435, 448 [24 Cal.Rptr.2d 751, 862 P.2d 751].)

"[A] trial court's failure to issue a statement of decision can have a significant adverse effect on that party's ability both to assess whether an appeal is justified and, if an appeal is filed, to present an effective challenge to the trial court's decision." (*Gruendl v. Oewel Partnership, Inc.* (1997) 55 Cal.App.4th 654, 661 [64 Cal.Rptr.2d 217].) For this reason, a trial court's failure to file a statement of decision following a timely request constitutes "per se reversible error." (*Miramar Hotel Corp. v. Frank B. Hall & Co.* (1985) 163 Cal.App.3d 1126, 1127–1130 [210 Cal.Rptr. 114]; see *Espinoza v. Calva* (2008) 169 Cal.App.4th 1393, 1397–1398 [87 Cal.Rptr.3d 492].)

Here, the trial court spread its rulings on equitable issues over three separate occasions. As detailed in the statement of procedure above, the court ruled on most equitable issues on September 26, 2000. However, it stated that it did not intend its decision to be final at the time because it had not made a decision concerning interest. It also took under submission whether to require an accounting or appoint a receiver. On November 16, 2000, the court announced a decision concerning interest but reserved the issue of whether to appoint a receiver. Finally, on December 28, 2000, the court announced that it would not appoint a receiver.

There can be no dispute that PHL requested a statement of decision within 10 days after the trial court issued the last part of its piecemeal tentative ruling. The trial court announced its tentative decision concerning the receivership issue on December 28, 2000, and PHL filed its request for statement of decision on January 5, 2001. The question is whether this request preserved

PHL's right to obtain a statement of decision on all equitable relief issues. We conclude that PHL's request was timely and adequate to require a statement of decision on all equitable relief issues.

Neither the statute (Code Civ. Proc., § 632) nor the rule applying the statute (Cal. Rules of Court, rule 3.1590) addresses whether the court's announcement of a tentative decision on some issues but reservation of other issues for later decision initiates the period during which a party must request a statement of decision. PHL argues that a tentative decision is not "announced" for the purpose of the statute until the court has ruled on all reserved issues. On the other hand, Wallis argues that the time period begins to run from the trial court's announcement of its decision on each question of fact. We conclude that the only reasonable and workable interpretation of the statute is that the time to request a statement of decision runs from the time the trial court completes the announcement of its decision on all reserved issues.

■ As noted, Code of Civil Procedure section 632 requires that "upon the trial of a question of fact by the court" the trial court must issue a statement of decision if a party makes a proper request "within 10 days after the court announces a tentative decision." Rule 3.1590(b) of the California Rules of Court states that a tentative decision is not binding on the trial court and may be modified, and rule 3.1590(d) allows that "[w]ithin 10 days after announcement or service of the tentative decision, whichever is later, any party that appeared at trial may request a statement of decision to address the principal controverted issues."

While the statute and rule do not expressly provide for the situation in which the trial court announces part of its decision but reserves some issues, common sense dictates that, for the purpose of the statute and rule, the 10 days does not begin to run until the trial court completes the announcement of its tentative decision on all issues. Nothing in the statute or rule provides for multiple requests for statements of decision as to individual issues. Therefore, the best reading of the statute and rule is that the 10 days begin to run when the trial court has announced its tentative decision on all controverted issues.

Wallis suggests, however, that because the statute applies "upon the trial of a question of fact by the court" (Code Civ. Proc., § 632), the time limit applies to the trial court's announcement of a tentative decision on each question of fact. In this case, such an interpretation would have required PHL to make three separate requests for a statement of decision to preserve all issues covered in the trial court's trifurcated announcement of its decision on the controverted issues. Other than the statute's reference to "upon the trial of

a question of fact by the court," Wallis offers no authority for this position, and we find no evidence that the Legislature intended this strained and unworkable interpretation. The wording of the statute, "upon the trial of a question of fact by the court," simply refers to a court trial, as opposed to a jury trial.

■ Applying the proper interpretation of Code of Civil Procedure section 632, we conclude that the trial court erred by denying PHL's request for a statement of decision made within 10 days after the court completed its announcement of its tentative decision on all controverted issues, ending with the court's tentative decision relating to appointment of a receiver.

Wallis argues that, even if PHL's request for a statement of decision was timely, PHL is not entitled to reversal because the request did not identify material issues for the trial court to resolve. (See *In re Marriage of Garrity and Bishton* (1986) 181 Cal.App.3d 675, 686–687 [226 Cal.Rptr. 485] [failure to make findings on immaterial issues not error].) Wallis claims that "many" of the 18 issues listed in PHL's request for a statement of decision were not material. Logically, however, the argument that "many" issues *were not* material is, in effect, a concession that at least some of the issues *were* material. Therefore, this argument fails because if any of the issues were material then a statement of decision was required.

■ Normally, the proper appellate remedy for improper denial of a request for a statement of decision is to reverse and remand for preparation of a statement of decision. (*Espinoza v. Calva, supra,* 169 Cal.App.4th at p. 1398.) However, that is impossible here. Judge Mock, who heard the case, is no longer available because he was disqualified. Therefore, the only appropriate appellate remedy in this case is a remand for a new trial on the equitable causes of action.

IV–VI*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment as to the jury verdicts is modified to award Wallis $15,000 against PHL, $2,000 against Wichmann, and $1,000 against Holmes in compensatory damages and $150,000 against PHL in punitive damages. With those modifications, the judgment as to the verdicts is affirmed but remanded for recalculation of prejudgment interest consistent with this opinion.

*See footnote, *ante*, page 814.

The judgment as to the equitable relief is reversed and remanded for a new trial.[5]

The parties will bear their own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(5).)

Robie, J., and Butz, J., concurred.

A petition for a rehearing was denied November 12, 2013, and the petition of appellant Dale M. Wallis for review by the Supreme Court was denied January 29, 2014, S214887.

---

[5] PHL's request for judicial notice filed October 5, 2012, and PHL's motion to strike portions of Wallis's reply brief or, in the alternative, to augment the record on appeal filed December 21, 2012, are denied.